**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRANDON C. MCGUIRE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 2564 DDN |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION**

Before the Court is the first amended petition of Missouri state prisoner Brandon C. McGuire for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Both parties have consented to the exercise of plenary authority by a United States Magistrate Judge under 28 U.S.C. § 636(c).  For the reasons set forth below, the petition is denied.

**BACKGROUND**

*The underlying convictions*

Petitioner McGuire was convicted in 2011 by a jury in the Circuit Court of the City of St. Louis of one count of first-degree murder, one count of forcible rape, two counts of forcible sodomy, murder in the second degree, first degree assault, and one count of kidnapping.  He was acquitted of one count of forcible rape.  His combined sentence included life imprisonment without parole for the first degree murder, plus a total of 150 years of consecutive sentences for the other counts.

The Missouri Court of Appeals described thus the facts of the case indicated by the trial evidence that supported the jury's verdicts:

**I. The Underlying Crimes**
On Halloween night, 2006, 16-year-old K.J. attended a party at a community center in St. Louis with her cousin. The two left the party, and K.J. arrived home around 10:00 P.M. K.J., however, did not stay at home long; she

1

received a phone call and left shortly thereafter to catch public transit. K.J. was in a good mood when she left.

A witness found K.J.'s body discarded in a dumpster the following morning. K.J.'s bloodied jeans were unfastened and pulled down to her knees; her shirt and sweater were pushed up. Various parts of K.J.'s body were bruised, blackened, and cut. K.J.'s anus was bloody and torn. Based on her body temperature, K.J. had died of mechanical asphyxiation 6-13 hours before her body was found at 9:00 A.M. The injury to her anus indicated that she had been violated with an object sometime near her death, but while she was still alive. DNA swabs of seminal fluid found on K.J.'s body indicated the presence of both male and female DNA—the male was unidentified, but the female profile matched K.J. The police did not charge anyone at the time.

Almost a year later, H.T. was walking late at night down Broadway in St. Louis with some friends. H.T. was in her third trimester of pregnancy. A car pulled up alongside H.T., and the driver asked her if she wanted a ride. Being tired, H.T. accepted. The driver eventually drove down a dead-end street and stopped the car. The driver asked H.T. if she "dated." H.T. took that to be an offer of money for sex. H.T. acknowledged that she had "dated" in the past, but on this night she declined.

The driver lunged at H.T., grabbing her neck with one hand and covering her mouth with the other. The driver climbed on top of H.T., and she blacked out. When H.T. briefly awoke, the driver said, "I killed you, bitch," and H.T. blacked out again. Next thing H.T. knew, she was lying in a puddle of blood on the street, naked from the waist down. Eventually, H.T. flagged down a car in the sparsely populated area. An ambulance was called and H.T. went to the hospital.

H.T.'s injuries were grave. The right side of H.T.'s uterus was torn, along with a main blood vessel, which resulted in bleeding to her abdomen. The torn artery also deprived her unborn baby of blood flow, and the baby died.[3] A doctor who treated H.T. testified that her injuries were caused by a blunt object inserted and pushed up into her vagina. That doctor stated that it would be "almost impossible" for a penis to cause such injuries—any suggestion that a penis caused H.T.'s injuries "bord[ered] on almost ridiculous." Seminal fluid was found on H.T.'s clothing and was sent to a crime laboratory.

At some point before November 1, 2007, McGuire's DNA was entered into the CODIS database.[4] On November 1, detectives in K.J.'s case learned that McGuire's DNA matched the male sample found on K.J.'s person. Shortly

thereafter, detectives in H.T.'s case learned that her jeans contained DNA from her, McGuire, an unknown male, and traces of a fourth person.

McGuire was arrested and charged with eight crimes relating to both victims.[5] Regarding K.J., the State charged McGuire with first-degree murder, forcible rape, and forcible sodomy. Regarding H.T., the State charged McGuire with forcible rape, forcible sodomy, first-degree assault, and kidnapping. The State also charged McGuire with second-degree murder for the death of H.T.'s unborn baby. The case proceeded to a jury trial.

\* \* \*

McGuire's version of Halloween 2006, when K.J. died, was relatively innocent. McGuire remembered trick or treating with his wife and son in the evening. At around 9:30 P.M., McGuire drove his son to his son's mother's house, arriving around 10:00 P.M. Immediately after dropping off his son, McGuire took the long way home to search for a prostitute.  McGuire found K.J., who waved at him. McGuire picked up K.J., had consensual sex with her in the front seat of his car, and left.  K.J. was alive, according to McGuire, when he left her. McGuire arrived home "[a]bout 10:45," and did not leave his home for the remainder of the night. (The State's evidence established that K.J. made a phone call around 11:30 P.M.)

McGuire also claimed to have had consensual sex with H.T. shortly before she was attacked. On that early morning, McGuire was cruising around, looking for a prostitute around 4:00 A.M. H.T. was walking on Natural Bridge road near Fairgrounds Park. H.T. flagged McGuire down, asking if he was looking for a "date." McGuire and H.T. agreed to have sex in exchange for a $10 piece of crack. McGuire remembered pulling out of H.T. to ejaculate and finding blood on his hand and penis. McGuire exclaimed, "Oh, hell no. You bleeding. Why are you bleeding?" H.T. replied, "I'm trying to get rid of this baby." Now totally freaked out by H.T., McGuire "opened up the door and pushed her out and drove off." When asked what condition H.T. was in when he left, McGuire explained, "I mean she was fine as far as I know. You know what I mean? I didn't run over her. I'm positive I didn't run over her or anything."

McGuire's wife, Meghan McGuire ("Meghan"), also testified for the defense. Meghan remembered McGuire arriving home on Halloween 2006 at "about 10:45, a little before 11." Meghan stated that she remembered because it was a holiday and that she always got a little jealous when McGuire drove to his son's mother's house, so Meghan always had a "little extra cautio[n]" about how long it would take McGuire to come back home. On cross-examination, Meghan acknowledged that she never told police or

prosecutors about this memory when they interviewed her, instead only revealing this memory about two weeks prior to trial.

_____
[Footnotes in text of opinion:]
3  The baby had cocaine in its system, but that was not the cause of death.
4  CODIS stands for Combined DNA Index System, and it is a database containing DNA profiles.
5  The State dismissed, by a *nolle prosequi*, a few additional charges.

*McGuire v. State of Missouri,* 523 S.W.3d 556, 559-62 (Mo. Ct. App. 2017).

### *Petitioner's direct appeal*

Petitioner directly appealed his convictions and sentences to the Missouri Court of Appeals.  His Points Relied On alleged violations of Missouri state law and the following three violations of the federal Constitution:

(1)     The circuit court erred by failing to sever the crimes involving victim Jackson from those involving victims Troupe and her unborn child.

(2)     The circuit court erred by sustaining the state's objection to evidence of a threat to kill Ms. Jackson made by her boyfriend Mr. Boyd.

(3)     The circuit court erred by failing to give a remedial jury instruction or to declare a mistrial after the prosecutor made an *ad hominem* attack on petitioner during closing argument.  (Doc. 16-4.)

The Missouri Court of Appeals affirmed.  *State of Missouri v. McGuire*, 370 S.W.3d 891 (Mo. Ct. App. 2012).  In its unpublished explanatory opinion, the appellate court ruled each of petitioner's points against him on their merits.  (Doc. 16-7.)

### *Motion for post-conviction relief*

On October 15, 2012, petitioner filed a 28-page pro se motion for postconviction relief under Missouri Supreme Court Rule 29.15. In it he alleged four categories of grounds for relief:

(1) The state failed to prove the elements of "the crime charged."

(2) The state prosecutor (i) knowingly withheld favorable evidence and (ii) allowed the trial to continue after learning petitioner did not get court ordered pretrial discovery.

(3) The circuit court committed 48 enumerated errors in petitioner's case.

(4) Appellate counsel rendered constitutionally ineffective assistance in listed ways. (Doc. 16-9 at 14-42.)

Petitioner also filed a pro se memorandum on appeal from the denial of post-conviction relief in which he alleged 141 errors committed by his trial counsel.  (Doc. 16-9 at 48-119.)

On January 28, 2013, petitioner through counsel filed an amended motion for postconviction relief in the circuit court under Missouri Supreme Court Rule 29.15.  In this motion he alleged he received constitutionally ineffective assistance of trial counsel because counsel:

(1)     Failed to strike potential juror Tanika Hale;

(2)     Failed to request the MAI-CR3d 3.10.10 pattern jury instruction regarding petitioner's prior convictions;

(3)     Opened the door to petitioner's prior arrest history by his questioning of petitioner on direct-examination;

(4)     Failed to request an alibi jury instruction based on MAI-CR3d 308.04 or .06;

(5)     Failed to object to certain testimony of physician witness Dr. Jane Turner;

(6)     Failed to impeach the testimony of witness Dr. David Stamilo;

(7)     Failed to cross-examine victim witness Harriet Troupe on her prior arrests and possible expectation of judicial leniency;

(8)     Failed to call as a trial witness Gloria Snulligan about the alibi of Mr. Boyd;

(9)     Failed to call as a trial witness Ronald Drake to counter the testimony of witness Harriet Troupe;

(10)     Failed to elicit trial testimony that law enforcement did not get a buccal swab to test for DNA from William Reid, who found one victim's body to determine whether Reid might be a potential killing suspect;

(11)    Failed to investigate and to call as trial witnesses Sharonda Butler, Latasha Haynes, and Kemara Belk;

(12)    Failed to include certain portions of pattern instruction MAI-CR3d 3.02.1 regarding juror note-taking in the instructions submitted to the jury;

(13)    Failed to cross-examine DNA analyst witness Kyra Lienhop about fingerprint evidence;

(14)    Failed to move for a change of venue due to media publicity; and

(15)    Failed to move for a mistrial when the state untimely disclosed an autopsy report.  (Doc. 16-11.)

The circuit court denied relief following an evidentiary hearing.  (Doc. 16-11 at 78-118.)    Petitioner appealed to the Missouri Court of Appeals.

### *Post-conviction relief appeal*

On appeal, petitioner raised the following grounds:    Trial counsel rendered constitutionally ineffective assistance of counsel by:

(1)    Failing to strike venireperson Tanika Hale;

(2)    Failing to request a jury instruction regarding petitioner's prior convictions as set forth in MAI-CR3d 310.10;

(3)    When questioning petitioner on direct examination at trial, opening the door to the admission of the otherwise inadmissible evidence of petitioner's arrest history;

(4)    Failing to request an alibi instruction to the jury in connection with the killing of victim KJ; and

(5)    Failing to cross-examine complaining witness HT about her prior arrests and whether she had any expectation of leniency for her testimony.
(Doc. 16-12.)

The Missouri Court of Appeals affirmed the denial of post-conviction relief.  (Doc. 16-14.)  *See McGuire v. State of Missouri*, 523 S.W.3d 556 (Mo. Ct. App. 2017).

## PETITIONER'S GROUNDS FOR FEDERAL HABEAS RELIEF

Petitioner's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 alleges the following ten grounds:

His trial counsel rendered constitutionally ineffective assistance because:

(1) He opened the door to otherwise inadmissible evidence of petitioner's prior arrest history;

(2) He failed to present evidence that some DNA and fingerprint evidence recorded at both crime scenes did not match petitioner's;

(3) He failed to call numerous witnesses at trial who could have supported his defense;

(4) He suffered severe health issues that prevented him from effectively preparing for trial and adequately representing petitioner during the trial;

(5) He failed to withdraw from the case so that he could testify at petitioner's trial that, during the lineup, H.T. was not able to identify petitioner;

(6) He failed to move for a change of venue for cause;

(7) He failed to challenge and strike juror Tanika Hale for cause; and

(8) He failed to request a basic series of instructions to the jury.

(9) The state knowingly used the perjured testimony of Det. Thomas Carroll to secure petitioner's conviction.

(10) The cumulative effect of each of the constitutional errors alleged in the petition infected the proceedings with unfairness and plaintiff should receive a new trial.

(Doc. 24.)   Respondent argues that Grounds 1 and 7 are without merit, and that the remaining grounds are procedurally defaulted and also without merit.   (Doc. 29.)

## EXHAUSTION AND PROCEDURAL BAR

A federal habeas corpus petitioner must exhaust his state law remedies before he may bring a petition under 28 U.S.C. § 2254.  A prisoner has not exhausted his state law remedies if he "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. §2254(c).  An appeal to an intermediate state appellate court exhausts state remedies in Missouri, permitting federal habeas review. *See* Mo. Sup.

Ct. R. 83.04; *Randolph v. Kemna*, 276 F.3d 401, 404 (8th Cir. 2002) ("Rule 83.04 ... makes clear that Missouri does not consider a petitioner who bypasses its supreme court in favor of federal habeas review to have denied the State its rightful opportunity to resolve federal constitutional claims.").

To preserve issues for federal habeas review, a state prisoner must fairly present his claims to the state courts during the trial court proceedings or post-conviction proceedings and on direct appeal. *Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997).  Failure to raise a denied claim in a post-conviction appeal is an abandonment of the claim and federal habeas review of the claim is barred. *Id*. at 1150; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A petitioner may overcome the procedural bar if he can demonstrate legally sufficient cause for default and actual prejudice resulting from it, or if failure to review the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Therefore, the prisoner "forfeit[s] his right to present his federal claim . . . unless he can meet strict cause and prejudice or actual innocence standards." *Greer v. Minnesota*, 493 F.3d 952, 957 (8th Cir. 2007).  Generally, to establish cause for a procedural default, petitioner must "show that some objective factor external to the defense impeded" his "efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. at 753.  To establish actual prejudice, petitioner "must show that the errors of which he complains worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ivy v. Caspari*, 173 F.3d 1136, 1141 (8th Cir. 1999).

Petitioner McGuire has exhausted his state court remedies only as to Grounds 1 and 7.  Grounds 2 through 6 and 8, 9, and 10 were either not presented to the Missouri circuit court or to the Missouri Court of Appeals and, therefore, under *Coleman v. Thompson*, they are procedurally barred from review by this Court.

Petitioner argues in his Traverse that the procedural default of not exhausting his remedies in the Missouri courts should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012).  In *Martinez*, the Supreme Court stated the issue thus:

> [W]hether a federal habeas court may excuse a procedural fault of an ineffective-assistance claim when the claim was not properly presented in

state court due to an attorney's errors in an initial-review collateral proceeding.

566 U.S. at 5.  The Court answered the question in the affirmative.  In doing so, it qualified *Coleman v. Thompson* "by recognizing a narrow exception:  Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9.  The "initial-review collateral proceeding" at issue is the initial application for relief from the state courts in collateral proceedings.  It does not include the appellate review of the denial of relief in the initial review proceeding.  *Id.* at 11-12, 16.  The Supreme Court stated the habeas respondent may defend against cause for a procedural default by showing the following with respect to trial counsel or initial-review counsel:

> ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.* it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

*Id.* 15-16.

*Martinez* applies to petitioner because in Missouri the only vehicle for litigating constitutionally ineffective assistance of trial counsel claims after a trial is a motion for post-conviction relief under Missouri Supreme Court Rule 29.15.  *See* Mo. S. Ct. R. 29.15(a).  *See Harris v. Wallace*, 984 F.3d 641, 648 (8th Cir. 2021).  In order for a claim to be heard under *Martinez*, petitioner "must show that (1) his claim of ineffective assistance of [trial court counsel] is 'substantial' and (2) the 'cause' for the default was that PCR Counsel was ineffective during the initial-review collateral proceeding. To show an underlying claim is substantial, 'the prisoner must demonstrate that the claim has some merit.'" *Id.*

Further, Congress has authorized this Court to consider procedurally barred grounds and to dismiss them, if they are without merit.  28 U.S.C. § 2254(b)(2).

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief can only be granted by a federal court on a claim that has been decided on the merits by a state when that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 (2010).   A state court's decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] [c]ourt's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* This standard is difficult to meet, because habeas corpus "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).   Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### *Constitutionally ineffective assistance of counsel*

Grounds 1 through 8 allege that petitioner McGuire's trial counsel rendered constitutionally ineffective assistance.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court determined that the right to effective assistance of counsel arises from

the Sixth and Fourteenth Amendments.  The right to counsel is "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  Under *Strickland*, a petitioner is entitled to federal habeas corpus relief upon a showing that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686.

In order to prevail on a Sixth Amendment claim, a petitioner must prove that (1) counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id*. at 697.

### *Ground 1*

In Ground 1, petitioner McGuire argues that his trial counsel rendered constitutionally ineffective assistance by opening the door to otherwise inadmissible evidence of his prior arrest history.  Petitioner raised this claim in his Rule 29.15 post-conviction motion and the circuit court found the claim was without merit. Petitioner appealed to the Missouri Court of Appeals, which affirmed.

The trial transcript indicates that introduction of petitioner's prior arrest record (Doc. 16-1 at 168) was due to petitioner's failure to truthfully answer his own defense counsel's question during petitioner's part of the trial.  During the evidentiary hearing in the circuit court on the Rule 29.15 motion, petitioner's trial counsel testified that he expected petitioner to testify truthfully that he had a criminal history.  (Doc. 16-8 at 39.) Defense counsel testified that he did not want to emphasize it and did not want the jury to pay attention to it.  (*Id.*) Petitioner's denial of any prior "trouble with the law," however,

11

in response to his counsel's question, contrary to his counsel's planned strategy, opened the door for the prosecution on cross-examination.  The trial court mitigated the prejudicial effect by narrowly tailoring the evidence to include petitioner's prior arrests without any details of those arrests.

The Missouri Court of Appeals stated the following regarding this matter:

> After the State's case-in-chief .  .  . , McGuire testified in his own defense. During direct examination, defense counsel asked McGuire, "Ever been in trouble with the law before?" McGuire replied, "No." At a subsequent sidebar, the prosecutor argued that defense counsel had opened the door to evidence of McGuire's prior arrest history, which would rebut the testimony that McGuire had never been in trouble with the law. The trial court allowed the prosecutor to inquire on cross-examination into the number of prior arrests, including the dates of the arrests. The trial court did not allow any evidence about the circumstances of those arrests. McGuire was evasive about his prior arrests, but he eventually admitted that he had probably been arrested "twice or more than twice." The prosecutor listed the dates of four arrests, but McGuire said he did not remember those arrests. Because McGuire testified at trial, evidence was also elicited regarding his prior convictions for assaulting a police officer, driving while intoxicated, and possessing a controlled substance.

*McGuire v. State of Missouri*, 523 S.W.3d 556, 561 (Mo. Ct. App. 2017; (Doc. 16-14 at 5.)

The appellate court stated more specifically:

> **IV. Point Three—Opening the Door to McGuire's Arrest History**
> During McGuire's testimony, defense counsel asked an open-ended question: "Ever been in trouble with the law before?" McGuire falsely answered, "No." At a subsequent sidebar, the State argued that defense counsel opened the door to McGuire's entire arrest history to rebut his testimony that he had never been in trouble with the law. The trial court allowed limited evidence of McGuire's arrest history. While permitting the State to elicit the number and dates of McGuire's past arrests, the State was not allowed to question McGuire about any substantive details. When the direct examination resumed, McGuire admitted to multiple arrests.
>
> Then, during cross-examination, McGuire admitted that he had been arrested "twice or more than twice." One of those arrests was associated with McGuire's prior conviction for assaulting a law enforcement officer; McGuire had already opened the door to evidence of that arrest and conviction by testifying at trial. The prosecutor identified four additional

dates on which McGuire had been arrested.[7] However, the trial court prohibited the State from identifying the reasons for those arrests. McGuire argues that defense counsel's open-ended question, leading to evidence about the number and dates of his prior arrests, constituted ineffective assistance of counsel.

Because we hold that the motion court did not clearly err in finding no Strickland prejudice occurred, we need not address the performance prong of Strickland. Strickland prejudice occurs only when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonabl[e] probability exists only if counsel's ineffectiveness undermines confidence in the outcome of the trial. Id.

The essence of this point on appeal relates to defense counsel's "opening the door" to evidence of McGuire's prior arrests. Evidence of McGuire's arrests would have been inadmissible but for defense counsel's broad questioning of whether McGuire had "been in trouble before." We note from the record that the State properly introduced at trial evidence of McGuire's prior convictions for assault on a police officer, driving while intoxicated, and possession of a controlled substance. Defense counsel's questions about McGuire's prior trouble bore no relation to the jury's knowledge of McGuire's three prior convictions. The State would have introduced conviction-related evidence with or without defense counsel's trouble-with-the-law question.

Importantly, defense counsel's trouble-with-the-law question opened the door *only* to evidence of McGuire's prior arrests. And equally important was the trial court's ruling severely limiting what the jury could hear about those prior arrests. The trial court permitted the State to identify the number and dates of McGuire's arrests, nothing else. The jury did not hear the context of those arrests. Thus, because of defense counsel's trouble-with-the-law question, the jury heard the dates of McGuire's four prior arrests that did not lead to a conviction.

We are not persuaded that the jury was so impacted upon learning that McGuire had four additional arrests, again, without any information regarding the substance of those arrests, so as to undermine our confidence in the jury's verdict. Our conclusion is supported by two cases in which defense counsel asked effectively the same question of a testifying defendant. See Branyon v. State, 304 S.W.3d 166 (Mo. App. E.D. 2009); State v. Johnson, 841 S.W.2d 298 (Mo. App. S.D. 1992).

In <u>Johnson</u>, a jury found the defendant guilty of attempted forcible rape. 841 S.W.2d at 298. At trial, defense counsel had asked the defendant, "Have you been in trouble before with the law on anything—ever?" <u>Id. at 301</u>. The defendant answered that he had been convicted of second-degree burglary; however, on cross-examination, the trial court allowed the prosecutor to elicit evidence that the defendant had been arrested twice before. <u>Id.</u> In affirming the motion court's finding of no prejudice, the Southern District noted that the arrests were unrelated to the crime at issue, and cross-examination on the arrests was brief and limited in scope. <u>Id. at 301–02</u>. Moreover, the other arrests were not emphasized or alluded to again by the state in witness testimony or closing argument. <u>Id. at 302</u>. Finally, the Southern District found that the evidence supporting the attempted-rape conviction was strong. <u>Id.</u> In addition to witness testimony, the defendant admitted that he was in the bedroom with the victim, he kissed her, he touched her breasts, and he struck her in the face. <u>Id.</u> The Southern District concluded, "When we view the limited evidence of Johnson's two unrelated arrests in light of the entire record, we are confident there is no reasonable probability that, but for his trial counsel's 'trouble with the law' question and its consequences, the result of the trial would have been different." <u>Id.</u>

We find the prejudice here to be similar to, although slightly greater than, <u>Johnson.</u> In both cases, defense counsel opened the door to evidence about the defendants' prior arrests. The arrests occurred years prior to the crime at issue in the trial. The arrests were unrelated to the charged offenses, and evidence about the arrests was limited in scope to the dates (and not the substance) of the arrests. Further, as in <u>Johnson</u>, the record includes strong evidence connecting McGuire to the scenes of both crimes on the nights they occurred. With regard to K.J.'s death, McGuire admitted that he had consensual sex with her shortly before her death. K.J. was found the next morning with her jeans unfastened and pulled down to her knees, exposing her torso. K.J.'s anus appeared bloody with some <u>tearing</u>; the medical examiner concluded that K.J.'s anus had been violated with a blunt object. The medical examiner also concluded that her injuries were inflicted near the time of death, but while she was alive. Swabs collected from K.J. revealed a mixture of male and female DNA, with the female DNA matching K.J. and the male DNA matching McGuire. With regard to H.T., McGuire again admitted to having consensual sex with her shortly before the crime occurred. McGuire also testified that, after having sex with H.T., he noticed that his hand and genitals contained blood, and he subsequently pushed H.T. out of the car. H.T. identified McGuire as her attacker, and several other witnesses described injuries to H.T. and the death of H.T.'s unborn baby. The evidence to support McGuire's convictions was strong.

14

We recognize the Johnson court emphasized that the State had not alluded to the prior arrests in closing argument. Here, the prosecutor briefly mentioned McGuire's evasive testimony about his prior arrests in closing arguments, suggesting that McGuire was lying. While this fact may slightly increase the prejudice to McGuire, we remain unconvinced that such prejudice undermined the jury's verdict given the other evidence of McGuire's guilt.

Branyon also supports our finding of no Strickland prejudice. 304 S.W.3d at 167. In Branyon, defense counsel also opened the door to evidence of the defendant's prior arrests by asking him if he had ever been in trouble. Id. On cross-examination, the defendant admitted a prior arrest for what he recalled as "assault of a child." Id. A majority of the court affirmed the motion court's finding of no Strickland prejudice. Id. at 169. In doing so, the majority noted that the State did not emphasize the arrest-related evidence and it was not alluded to again at trial. Id. Further, there was "significant credible evidence" of the defendant's guilt at trial. Id. The dissenting opinion would have found that Strickland prejudice did occur. Id. at 179. The dissent stressed that the case, for child molestation, boiled down to a "he said/she said" scenario for the jury, and that the evidence was not terribly strong. Id. at 175. The dissent also noted that the prior arrest (for "assault of a child") was "of the same nature of the crimes for which [the defendant] was on trial." Id. at 177. Thus, according to the dissent, the prior-arrest evidence substantially increased the likelihood that the jury used those prior arrests when deliberating on the defendant's credibility and guilt. Id.

The prejudice in Branyon, which the majority concluded did not constitute Strickland prejudice, was demonstrably greater than here. Unlike Branyon, McGuire's alleged crimes were not based entirely on "he said/she said" evidence. Physical evidence and McGuire's own testimony put him with the victims, having sex with them, shortly before the crimes happened. The jury did not make its decision based purely on the competing credibility of the victim versus the defendant. Further, unlike in Branyon, where the prior arrest was similar in nature to the prosecuted crime, the jury here was never told the nature of McGuire's arrests. Thus, the evidence was much more similar to Johnson—unspecific, unrelated prior arrests. As such, it is less likely that the evidence of McGuire's prior arrests played a role in the determination of his guilt. Lastly, we note that the jury acquitted McGuire on one count (forcible rape of H.T.). This acquittal suggests that the jury did not use McGuire's prior arrests as propensity evidence to blindly convict him of all crimes with which he was charged. Instead, the jury demonstrated its ability to consider each count individually to determine whether the facts supported a conviction.

> In conclusion, the motion court found no reasonable probability that, but for defense counsel's unprofessional errors, the result of the proceeding would have been different. We are not definitely and firmly convinced that the motion court was mistaken in finding no Strickland prejudice. Thus, the motion court's judgment was not clear error. Point Three is denied.

*Id.* at 566-68.

In *Krimmel v. Hopkins*, 44 F.3d 704 (8th Cir. 1995), following his arrest for murder, Krimmel gave the police three statements. Before trial he claimed the first one was involuntary, but the trial court disagreed. At trial the state used only the first statement. When Krimmel decided to testify after the state closed its case, the trial court held a conference in chambers. Krimmel's counsel advised him to testify in an effort to gain conviction on a reduced charge, but also told him that the second and third statements would be admissible on impeachment or rebuttal. Kimmel nevertheless took the stand and testified about a prior felony conviction and that he had lied in his statements to the police. The prosecutor cross-examined him on his inconsistent statements and played their recordings to the jury on rebuttal. In his federal habeas case, Kimmel argued that his trial counsel was constitutionally ineffective for failing to object to the statements and for not making an adequate suppression hearing record. The Eighth Circuit Court of Appeals affirmed the district court's decision that Kimmel had not demonstrated that he was prejudiced, even though the police re-interrogating him after he requested an attorney was a violation of the Fifth Amendment. 44 F.3d at 710 ("By taking the stand and discussing during his direct examination his second and third statements to the police, Krimmel opened the door, allowing the State to introduce the statements into evidence," and ruling there was no reasonable probability that the result [of the trial] would have been different.)

In petitioner McGuire's case the state courts' denial of relief on this ground involved a reasonable application of established federal law to a well-established factual record. The record clearly establishes that there is no reasonable probability that the outcome of petitioner's trial would have been any different had the limited information about petitioner's arrests not been communicated to the jury. Petitioner was not deprived of a fair trial.

16

Accordingly, Ground 1 is without merit.

### *Ground 7*

In Ground 7, petitioner argues that his trial counsel rendered constitutionally ineffective assistance by failing to strike juror Tanika Hale for cause. Under *Strickland*, regarding such a ground for relief, this habeas court must focus on the record regarding whether juror Hale was shown to be partial or impartial. *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Fuller v. Bowersox*, 202 F.3d 1053, 1056 (8th Cir. 2000).

Following the evidentiary hearing on the Rule 29.15 motion, the circuit court made the following findings:

> Counsel recalled Juror number 810, Ms. Hale. The transcript reflected that Ms. Hale responded she "couldn't do it" when asked if she could hear testimony and view photographs of a graphic nature (Tr. 166-167). Counsel testified he did not move to strike her for cause. Counsel also asked Movant if there were persons on the panel he did not want on his jury. Movant indicated which persons he did want and which persons he did not want on his jury. Counsel was certain Movant approved of the panel which was selected. Counsel was asked how his not moving to strike Ms. Hale could have been a positive for the defense. Counsel replied that simply because the juror was squeamish about graphic matters did not mean she could not give his client a fair trial. Counsel also did not move to strike Ms. Hale peremptorily because there were other persons he wanted off the jury more than Ms. Hale.
>
> On cross-examination of Counsel regarding Ms. Hale's statement during voir dire that she "couldn't do it," it was noted that there were no sexually graphic testimony or graphic photographs with the exception of one graphic photo which showed the genitals of K.J. There were no photos of H.T. Regarding H.T., the "graphic" testimony was only that she had performed a consensual act of prostitution. Ms. Hale was an accountant, had no children, and counsel believed that she could have been helpful to the Movant. Counsel noted that where there is primarily circumstantial evidence prosecutors prefer not to have an accountant as a juror because accountants prefer facts. Counsel restated that he went over the jury panel with Movant and that he asked Movant whether there was anyone that Movant did not

want on the jury. Counsel testified that Movant approved the jury that was selected. The State had many photos and many were excluded at the trial.

(Doc. 16-22 at 84-85.)   Later, the circuit court made the following conclusions on this ground for relief:

2. The first allegation in Movant's Amended Motion is that Counsel was ineffective for failing to move to strike for cause or to peremptorily strike Juror Tanika Hale. Movant states that Juror Hale unequivocally stated in response to trial counsel's question during defense's voir dire, that she could not listen to testimony or view pictures of a graphic sexual nature. (Tr. 165-166). The following question was asked of venireperson Hale:  Mr. Sims: I understand. Anyone else in the box that feels as Juror 601 feels, that there could be a point where the testimony or the picture and something that's put forth is of such a nature that it just turns you off and you can't focus on that? Anyone in the pews to my right? Juror Number 810 please stand. Venireman Hale: I couldn't do it.  Mr. Sims: You couldn't do it?  Venireman Hale: No. (Tr. 166-167) This appears to be the only reference to Ms. Hale in the transcript.

Movant's Counsel raised this question to the venire panel.  Counsel was highly credible and clear in his testimony at the evidentiary hearing that he did not move to peremptorily strike Ms. Hale because he felt there were other persons who were more prejudicial to his client. Counsel testified that simply because Ms. Hale was squeamish about graphic evidence did not mean she could not give his client a fair trial. Counsel's action in not moving to strike Ms. Hale for cause or peremptorily was not unreasonable and it reflected an intentional reasonable trial strategy. His conclusion that the fact she was squeamish about graphic material did not mean she could not give his client a fair trial was reasonable. Similarly, Counsel's conclusion that there were others on the panel who mere more prejudicial to his client and who he wanted off the jury more than Ms. Hale, was reasonable. As addressed by the State on cross-examination of Counsel, the sexually graphic testimony and photos were limited at the trial. Ms. Hale did not respond to any other questions indicating that she could not be fair and unbiased. Additionally, near the end of voir dire, Counsel asked the panel if there was anything that would prevent anyone on the panel from being fair and impartial to both sides and Ms. Hale did not indicate she could not be fair.

Counsel also testified that Movant had approved the panel and did not tell Counsel that he did not want Ms. Hale as a juror. While Movant testified at the evidentiary hearing that he told his attorney he did not want any juror

who had been raped on his jury and he believed Ms. Hale had been, there is nothing in the record to support this belief and she did not respond when this question was asked of the venire panel. The record does not support a finding that Juror Hale could not be fair or was biased against Movant or that Movant's counsel was ineffective for failing to move to strike Juror Hale for cause or peremptorily. Movant's first allegation is without merit and must be denied.

(*Id.* at 96-98.)

On this ground the Missouri Court of Appeals stated:

**II. The Trial**

During voir dire, defense counsel asked a general question to the venire, and Juror Tanika Hale ("Juror Hale"), who was an accountant, eventually responded following another juror's answer:

[Defense counsel]: Okay. Now, in the box, I anticipate there is going to be some very graphic testimony about things of a sexual nature, and I address this to everyone in the box at this time and to the people in the front chairs. Will any of you have any difficulty in sitting and listening to testimony from a young woman concerning matters of a **graphic sexual nature**? And the reason I'm asking because some people will, you know, can get turned off and don't want to listen, and if you do, if it's going to bother you, and I anticipate there may be pictures, if it's going to bother you, now is the time to let it be known.

> [Defense counsel]: ... Juror Number 601.

> [Juror 601]: Yes. I would have a problem with that. The visual aids, I would have a problem.

> [Defense counsel]: So you would think that you may be turned off to the point where you may not even listen to the testimony?

> [Juror 601]: If it's graphic like that, it might be a stopping point for me.

> [Defense counsel]: So you would think that you may be turned off to the point where you may not even listen to the testimony?

> [Juror 601]: If it's graphic like that, it might be a stopping point for me.

> [Defense counsel]: I understand. Anyone else in the box that feels as Juror 601 feels, that there could be a point where the testimony or the pictures and something that's put forth is of such a nature that it just turns you off and you can't focus on that? Anyone in the pews to my right. Juror 810, please stand.
>
> [**Juror Hale**]: I couldn't do it.
>
> [Defense counsel]: You couldn't do it.
>
> [**Juror Hale**]: No. [Emphasis added.]

No additional questions were asked of Juror Hale about her ability to weigh evidence of a graphic sexual nature. Neither party moved to strike Juror Hale, and she served on petit jury.

*McGuire*, 523 S.W.3d at 560-61.  The Missouri Court of Appeals denied petitioner relief on this ground stating:

> If the venireperson admitted significant bias and was not rehabilitated in voir dire, counsel's failure to challenge that juror *overcomes the presumption of effectiveness* that we normally afford to defense counsel in the <u>Strickland</u>-performance analysis. Pearson, 280 S.W.3d at 645. If defense counsel failed to strike an unqualified juror who then served on the petit jury, defense counsel failed to exercise the customary skill and diligence of a reasonably competent attorney, *unless* defense counsel articulates a reasonable trial strategy for keeping the unqualified juror. <u>Id.</u> If no reasonable trial strategy is articulated, the movant has satisfied the performance prong of <u>Strickland</u>. <u>Pearson</u>, 280 S.W.3d at 645. Moreover, where defense counsel unreasonably fails to strike an unqualified juror for cause, the post-conviction movant is entitled to a presumption of Strickland prejudice. <u>James</u>, 222 S.W.3d at 307; <u>White</u>, 290 S.W.3d at 165.
>
> We do not address whether Juror Hale was an unqualified juror. We will assume, without deciding, that Juror Hale was an unqualified juror because she unequivocally stated that she could not view all of the evidence. Nevertheless, we find no clear error in the motion court's finding that defense counsel articulated a reasonable trial strategy for not striking Juror Hale.
>
> The motion court explicitly found defense counsel's testimony to be "highly credible." Defense counsel testified that, in his opinion, Juror Hale's "squeamish" disposition about graphic evidence did *not* mean she would be unfair to McGuire. The motion court found this explanation reasonable.

20

Further, defense counsel credibly testified that he discussed the jury composition with McGuire, who approved of all the jurors who eventually served on the petit jury. Defense counsel's testimony suggests that neither he nor McGuire considered Juror Hale's squeamishness to be a concern at trial.

Beyond defense counsel's minimal concern regarding Juror Hale's fairness, defense counsel further testified regarding his opinion that Juror Hale would have been helpful to the defense. We acknowledge that defense counsel did not remember much about Juror Hale specifically, but the State reminded him about Juror Hale's demographics. Juror Hale was an accountant with a post-graduate degree. She was single and without children. Defense counsel testified that this case concerned sexual assaults and the murder of an unborn baby and a 16-year-old girl. When asked if having a juror without children would be more beneficial to the defense than someone with children, defense counsel agreed. Defense counsel also testified to his belief that accountants, in his experience, are "very meticulous." Such a meticulous juror might be helpful to the defense in holding the State to its burden of proof in a case based on circumstantial evidence.

McGuire also contends that defense counsel was ineffective for failing to use a peremptory strike on Juror Hale. In addition to the above strategic reasons for not striking Juror Hale, the motion court found defense counsel's testimony to be credible when he stated that other persons on the venire panel were more prejudicial to the defendant. Defense counsel was well within a reasonable trial strategy to exercise his limited peremptory challenges on more worrisome jurors.

Given our record, we are not definitely and firmly convinced that the motion court erred in a finding that defense counsel exercised a reasonable trial strategy by not striking Juror Hale, either for cause or with a peremptory strike. Thus, we cannot find clear error. McGuire has failed to satisfy the performance prong of Strickland. Point One is denied.

*Id.* at 564-65 (footnotes omitted.)

The Missouri circuit court denied relief to petitioner on this ground because Juror Hale was not shown to be biased, but in fact was considered by defense counsel to be a potential juror who would require the prosecutor to prove facts in a circumstantial evidence case, and because defense counsel's decision not to strike her was a strategic one. The Missouri Court of Appeals, even assuming she was not qualified to be a juror because of the statement she made about not being able to view all the evidence, affirmed the Rule

29.15 motion court's denial of relief because defense counsel's decision not to strike her was reasonable strategy.

 The state courts' decisions on this ground were reasonable applications of federal law based upon a clearly established factual record.

Accordingly, Ground 7 is without merit.


## Procedurally barred Grounds 2 through 6, and 8 through 10

As to Grounds 2-6 and 8-10, petitioner did not exhaust his available state court remedies in the post-conviction motion litigation under Missouri Supreme Court Rule 29.15.  Under *Coleman v. Thompson*, 501 U.S. 722 (1991), these grounds for relief are procedurally barred from consideration by this federal habeas court, unless *Martinez v. Ryan* applies to Grounds 2 through 6 and 8 and petitioner establishes that his Rule 29.15 motion counsel rendered constitutionally ineffective assistance in not including them in the motion.

*Martinez v. Ryan* applies only to Grounds 4 and 5.  Among the procedurally defaulted grounds, they were the only ones not presented to the state circuit court in the amended Rule 29.15 motion.  *Martinez* does not apply to Grounds 2, 3, 6, and 8 because they were presented to the Missouri circuit court in the Rule 29.15 proceedings and they were decided by that court.  *Martinez*, 566 U.S. at 16.

Grounds 9 and 10 do not qualify for consideration under *Martinez* because they do not involve claims of constitutionally ineffective assistance by trial counsel.


### *Ground 2*

In Ground 2, petitioner alleges that his trial counsel rendered ineffective assistance of counsel by failing to present at trial evidence that some DNA and fingerprints recovered at both crime scenes did not match petitioner's.   This ground is without merit.

The involvement of DNA and fingerprint evidence, among other issues, was discussed by the trial judge with counsel for both sides in a conference shortly before opening statements at trial:

MR. BIRD [the prosecutor, addressing defense counsel, Paul Sims]:  Are you intending on – she was found located in a dumpster.  Outside the dumpster there is some trash.  One of the items that's located in the trash outside the dumpster is this harness.  It's kind of a – it's a harness that belongs to this woman whose car was stolen.  She had this harness in her car.  It's kind of a sexual harness thing.  There is no DNA linking the harness to either anybody that's involved in this, the victim, the defendant, or any other people whose DNA was  swabbed or anything like that, taken.  So are you intending to mention the harness or go into the harness at all?

MR. SIMS:  I hadn't.  I mean I hadn't planned on it, but again, it's what your police officers get up there and testify to.  What they say.  I can't say that I'm not going to mention it in my case.

THE COURT:  Well, we're satisfied you're not going to mention it.  So if it comes up in some other manner –

(Doc. 16-1 at 70,  Trial Trans. pp. 225-26.)

This ground was raised in petitioner's Rule 29.15 motion but its denial was not presented to the Missouri Court of Appeals.  In denying this ground, the circuit court held:

14. The thirteenth allegation in Movant's Amended Motion is that Counsel was ineffective for failing to elicit, on cross-examination of DNA analyst Kyra Lienhop, that there was DNA and fingerprint evidence at the scene where K.J.'s body was found, that did not match Movant's. Specifically, Movant complains that DNA taken from a swab of the inside of the harness, found in a cardboard box belonging to a woman whose car had been stolen, was consistent with three unidentified individuals. Also, that an unidentified fingerprint was lifted from the cardboard box.  Prior to trial, the prosecuting attorney advised the Court that there were items located outside the dumpster, including a harness that belonged to a woman whose car was stolen; that the harness had been in the woman's car; and that there was no DNA linking the harness to the victim, the defendant, or any other person whose DNA was swabbed. Defense counsel responded that he did not intend to mention the harness unless the police testified to something which required the submission of this evidence.  (Tr. 225-226)

The body of victim K.J.'s was found in a trash dumpster.  Many other items were found in and around the dumpster with K.J.'s body.  The fact Movant's DNA was not on the harness might have been helpful if the harness was attributed to K.J.'s death.  However, the harness was not. The fact that there were unrelated items in or around a trash dumpster was to be expected and

> there was nothing to suggest any relation of these items to this homicide. Had it been brought out at trial that Movant's fingerprints were not present on the harness, nor on the other items unrelated to the homicide, there is no reasonable probability that the result of the trial would have been different. Movant's thirteenth allegation is denied.

Doc. 16-11 at 113-14.)

The circuit court record, both at trial and in the Rule 19.15 proceedings, establishes that the circuit court believed to be inadmissible the scant extant evidence of the possibility another person was involved in the killing of K.J., whose body was found in the dumpster. Such evidence of another perpetrator was entirely speculative and without any substantial relationship to petitioner's case.  There was not even a bare suspicion that the subjects of the evidence had any relationship with the decedent or any part in her killing.  Missouri requires the potential criminal liability of a third party be shown with evidence that indicates the subject had an opportunity and a motive to commit the crime charged against the defendant. *See State v. Rousan*, 961 S.W.2d 831, 838 (Mo. banc 1998); *cf., Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (ruling the Constitution permits judges to exclude evidence that is only marginally relevant).   The Missouri circuit court's view of the factual record presented at trial and the applicable law was not unreasonable.  *Mays v. Hines*, No. 20-507, 592 U.S. ____,  2021 WL 1163729,  at *3 (Mar. 29, 2021) (per curiam) (upholding state court's post-conviction denial of relief on claim that habeas petitioner's trial counsel rendered ineffective assistance because he did not try harder to blame another person for the murder for which habeas petitioner was convicted).

The Missouri circuit court reasonably applied federal law to a clearly established factual record.  Ground 2 is without merit.


### *Ground 3*

In Ground 3, petitioner argues that his trial counsel rendered constitutionally ineffective assistance by failing to call as witnesses at trial Gloria Snulligan, Sharonda Butler, Latasha Haynes, Kemara Belk, and Ron Drake.  This ground was presented to the circuit court in petitioner's Rule 29.15 motion, but its denial was not raised on appeal.

At the Rule 29.15 evidentiary hearing (Doc. 16-8, Trans. of hearing) , petitioner's trial counsel was questioned about these witnesses, but petitioner did not produce Ms. Snulligan, Sharonda Butler, Latasha Haynes, and Kemara Belk as hearing witnesses.  The circuit court ruled as follows:

> 12. The eleventh allegation in Movant's Amended Motion is that Counsel was ineffective for failing to call Sharonda Butler, Latasha Haynes, and Kemara Belk to testify at trial or to provide their testimony in the form of an offer of proof. Movant alleges he wanted these individuals to testify at his trial, and he asked Counsel to call them. Counsel did not call them to testify, even after endorsing two of them as defense witnesses. Movant wanted them to testify at trial regarding the same statements that these witnesses made to the police before trial. Movant alleges Counsel had the police reports which indicated that all three women knew Joel Boyd and K.J.; and that one or more of these individuals knew Mr. Boyd treated K.J. poorly and had threatened to take her life prior to the date of her death. Movant alleges that from the police reports and other information provided through discovery, Counsel knew or should have known how to contact these witnesses but failed to contact, subpoena or call them as witnesses at trial. These three witnesses did not testify at the evidentiary hearing on Movant's Amended Motion. As noted herein, allegations contained in a post-conviction motion are not self-proving and Movant has the burden of proving his asserted grounds by a preponderance of the evidence. The Court finds that Movant's eleventh allegation is without merit and is denied.

(Doc. 16-11 at 111-12.)

The circuit court's denial of Rule 29.15 relief regarding these potential witnesses was reasonable.  This ground for relief is without merit for lack of evidentiary support.

Regarding Ron Drake as a witness, the circuit court ruled as follows:

> 10. Movant's ninth allegation is that Counsel was ineffective for failing to call Ronald Drake to testify regarding statements the police reported Drake made to them. After the crimes occurred, Mr. Drake told police that when he, H.T. and Glenda Nelson were walking to the Philips 66 service station at Grand and Broadway, he saw H.T. get into a dark maroon or burgundy colored car with tinted windows. At trial H.T. testified that the car looked like a dark colored Impala and she identified the photograph of the car as a four door gray Impala. Counsel cross-examined H.T. about the color of the car that she described to police. H.T. acknowledged that she told police the car was kind of brownish in color and admitted that the Impala was not in fact brown. She further testified that it was dark at the time of the incident,

that she knew the name of the car and it looked brown at the time. When she went to view the car, the police did not tell her it was the car involved in the incident but asked her if she could pick out the car. Movant alleges Mr. Drake would have assisted his defense by injecting evidence suggesting that another individual in a dark maroon colored car committed the offenses. Movant alleges Mr. Drake would have contradicted the State's theory of the case.

At the evidentiary hearing Counsel testified regarding Mr. Drake's statement that he saw H.T. in a dark maroon or burgundy colored car. Counsel testified that he did not pursue this issue because it was dark out at that time, there were other things counsel could point to and this issue would not make or break the case. Counsel did cross-examine H.T. with regard to the discrepancies in the description of the car's color.  Importantly, H.T's blood was found in Movant's car, an Impala.  This Court finds that there is no reasonable probability that had Mr. Drake testified, the result of the trial would have been different. Movant's ninth allegation is denied.

(Doc. 16-11 at 109-10.)

The circuit court's determination that, had Ronald Drake testified at the trial, the outcome would not have changed is supported by the evidentiary record and the denial of relief on that ground is a reasonable application of the *Strickland v. Washington* constitutional standard.  This ground is without merit.

### Ground 4

In Ground 4, petitioner argues that his trial counsel rendered ineffective assistance of counsel by failing to withdraw from representing petitioner, because counsel was undergoing treatment for serious cancer and his family members had serious medical conditions, which affected his ability to represent petitioner.

The circuit court record indicates that on January 13, 2011, two weeks before petitioner's trial was to begin, trial counsel filed a motion for leave to withdraw from representing petitioner.  That motion states the only reason for the withdrawal was that it was requested by petitioner.  There is no mention of any medical condition that might render counsel unable to represent petitioner competently.  (Doc. 16-2 at 62.)  The trial court heard the matter on January 14, 2011, and denied the motion.   (Doc. 16-2 at 14.)

26

During the Rule 29.15 motion evidentiary hearing, trial counsel testified that he began representing petitioner in either 2008 or 2009. After being retained, counsel learned he had been diagnosed with cancer. After he recovered from the cancer, "around 2010 or 2011," he began actively working on the case.

The circuit court made the following relevant findings of fact:

At the evidentiary hearing, Movant's trial counsel, Paul Sims, ("Counsel"), testified that he has been an attorney for approximately thirteen years. Counsel works in private practice focusing on criminal defense. Counsel estimated he had tried over fifty jury trials ranging from misdemeanor drug, up to assault, armed criminal action, robbery, rape and murder. The instant case was Counsel's first murder trial. The Court's minutes reflect that Movant was indicted in February of 2008 and Counsel entered his appearance in May of 2008. Counsel recalled that he had represented Movant before he was indicted and recalled being present at a lineup involving Movant.

This case went to trial in 2011 regarding victims H.T. and K.J. Movant was incarcerated the entire time from his arrest to trial. Counsel testified that he had communicated with Movant during jail visits, in writing and at court appearances. Counsel believed they discussed witnesses in 2008-2009. When Counsel became ill he gave Movant the option of hiring another at attorney.

Movant initially told counsel he wanted to stay with him, however, closer to trial, Movant became disenchanted with counsel, culminating in Counsel filing a Motion to Withdraw. Counsel testified that the breakdown in their relationship began when Counsel was still sick and weak and he could not answer questions to Movant's satisfaction. In his Motion to Withdraw, Counsel advised the Trial Judge that Movant had lost confidence in him and that, with the high stakes facing Movant, Counsel believed Movant should have his choice of representation. Counsel did not state in the Motion to Withdraw that he was a witness to the lineup involving Movant.

Counsel recalled being physically present at the lineup involving Movant, but he did not hear H.T. identify Movant in the lineup; whereas the police reported that H.T. said "that's the guy.", referring to Movant. Counsel testified that he did not advise the Trial Judge about witnessing the lineup because his reason for the filing of his Motion to Withdraw was because his client had lost confidence in him.

(Doc. 16-11 at 81-82.)  Further, the circuit court discussed the post-conviction evidentiary record:

> Movant testified that when he saw Counsel before his trial, Counsel was not familiar with his case, had been on a honeymoon, stayed less than two hours and yawned in his face. However, Movant admitted that he did not tell the Trial Judge that Counsel was mentally unfit and sick. Movant tried to hire another attorney, Scott Rosenbloom. Mr. Rosenbloom's fees were $10,000 to enter and $60,000 for the trial. Movant also applied for a public defender. During the course of his trial Movant talked to Counsel and gave him questions to ask, but Movant did not want to interrupt the proceeding. Movant filed a pro se post-conviction motion and a second pro se motion because his post-conviction attorney did not attach the first pro se motion to the amended motion.

(Doc. 16-11 at 93.)

The circuit court described testimony of petitioner's trial counsel regarding his preparation for trial thus:

> Regarding documentary evidence received at or near the time of trial, such as the autopsy report of K.J., Counsel testified that the defense had prior knowledge of the contents of these documents and that the CAT scan did not add anything to the victim's medical records. Counsel testified he did not believe he would have received a continuance or mistrial, if either were requested for this reason. Counsel testified that he believed he did the best he could with what he had. Counsel met with Movant prior to trial and tried to prepare him for testifying. Movant did not have any problems making his wishes known to Counsel and Movant actively participated in his case and defense. Counsel testified he believes that a person on trial for his life should have an attorney of his choice. Counsel acknowledged that whether to grant his Motion to Withdraw was the Trial Judge's decision and that this case was four to five years old at the time of trial. Counsel aggressively cross-examined the State's witnesses, succeeded in keeping out many prejudicial photos and was able to have admitted into evidence the testimony regarding the "alibi" of the timeline.

(Doc. 16-11 at 90.)

Petitioner does not allege any specific way in which trial counsel's health condition adversely affected his representation of petitioner, other than generally to state that counsel's "medical problems help to explain his total lack of investigation of the

prosecution's case, including his failure to prepare for trial and call several key witnesses." (Doc. 24 at 22.)  In fact, the record indicates that defense counsel stated that petitioner, with all the consequences he was facing in this trial, should be represented by counsel of his choice.  When he moved for leave to withdraw, counsel urged only that petitioner desired it, not that he should withdraw for health reasons.  Petitioner has failed to sufficiently state how counsel's medical condition made counsel's representation of him constitutionally ineffective.  *Johnson v. Norris*, 207 F.3d 515, 518-19 (8th  Cir. 2000) (ruling habeas petitioner not entitled to a presumption of *Strickland* prejudice due to trial counsel's medical condition; rather, petitioner must point to specific acts or omissions of counsel as a basis for establishing prejudice).

This ground for relief is without merit.


### Ground 5

Ground 5 alleges his trial counsel failed to withdraw from representing him so counsel could testify at trial that during a lineup identification procedure victim H.T. did not identify petitioner as the perpetrator.  This ground was not alleged in the amended Rule 29.15 motion, and was not presented to the Missouri Court of Appeals.

Petitioner adverts to the pretrial conference in the chambers of the trial judge with the prosecutor and petitioner's counsel.  The trial judge discussed with counsel the prosecutors' oral motions in limine.  The prosecutor, John Bird, asked the trial judge about defense counsel's apparent intention to cross-examine victim H.T. about her failing to "pick up the remains of the baby from the [Medical Examiner's] office or provide a funeral for the baby.  I'm not sure how that's relevant."  This colloquy followed:

> MR. SIMS [(defense counsel)]:   I believe it's relevant because, your Honor, she wants to claim and she according to the police report stated that she wants  -- that she said this is the guy, even though I didn't hear it, this is what the police officer put in his report when she saw my client in the lineup, she supposedly blurted out, "That's the man that killed my baby."  And if they're trying to portray her as being emotionally attached to this baby, then I need to be able to rebut that with the facts that she didn't even do anything

to try and claim the remains of the baby to give the baby a proper burial. That baby had to be buried by Innocence Program.

MR. BIRD:   Guardians of Innocence.  And the fact that she doesn't have money to properly bury her child has no bearing on this case.  She has no money.

MR. SIMS:   May I respond, your Honor?  They had told her at that time about programs for her that would allow her to do this free, and she did not contact any of the people that were able to do this, not until they had her in the police station and they then approached her with it again, she then signed over.

MS. GRANGER [(prosecutor)]:    This isn't a neglect case.  It's not a child abuse case.

THE COURT:  Yeah, I'm not going to allow that.  I mean I can understand how someone can be distraught when she sees someone she believes killed her baby and still not do anything afterwards with regard to the dead baby.  I mean, so I won't allow that.

MR. BIRD:   In his argument, he  brings up this issue with regards to Harriet Troupe when she does identify him, making a statement, and he says that he did not hear the statement.  So Paul [(Sims)], are you going to try and inject yourself as a witness in this particular case?

MR. SIMS:   No, I'm not, but I'm just saying that this was in the police report, and I was there, and I didn't hear it and I'm standing right next to her.

MR. BIRD:   So are you going to ask the police officer or Ms. Troupe, are you going to sit there and say, "Well, I didn't hear you make this statement"?

MR. SIMS:   I thought I just said I was not going to interject myself as a witness.

THE COURT:  Okay.  That's it.  Okay.

(Doc. 16-1 at 71-72, Trial Trans. at 231-33.)

During the trial, Harriot Troupe testified on direct examination about her first encounter with petitioner.  Shortly after midnight she and a friend walked to a store near factories where her friend would meet a friend on his work lunch break.  After stopping at

a convenience store she followed her friends walking away from the area.  While walking by herself, a car pulled up and the driver asked her if she needed a ride.  She said yes and got into the front passenger's seat.  During her testimony she described the driver as having brown eyes, a "low haircut," and light brown skin.  She testified she looked at his face, but mostly remembered his light colored eyes.  After some conversation, he attacked her and began strangling her in the car.   During the attack she looked at his face and saw his expression.  Later in her direct examination she testified that she identified her attacker during a physical lineup at the police station.  When showed a photo of the lineup at trial, she identified the second subject.  In the courtroom she identified petitioner as her attacker. (Doc. 16-1 at 123-29.)

On this ground for relief, the circuit court stated as follows:

> Counsel recalled being physically present at the lineup involving Movant, but he did not hear H.T. identify Movant in the lineup; whereas the police reported that H.T. said "that's the guy.", referring to Movant. Counsel testified that he did not advise the Trial Judge about witnessing the lineup because his reason for the filing of his Motion to Withdraw was because his client had lost confidence in him.

(Doc. 16-11 at 82.)  Further, the circuit court recounted the hearing testimony of petitioner on this ground:

> Movant also testified at the evidentiary hearing. Movant testified that he was represented by Counsel, and that Counsel was present at the lineup where H.T. was present. Movant was asked if he had any conversations with Counsel as to what Counsel heard witnesses say at the lineup. Movant testified that Counsel replied he had, but could not recall the conversation.

(Doc. 16-11 at 91.)

On the merits of this ground, as respondent argues, the Missouri Rules of Professional Conduct prohibit an attorney from acting as trial counsel when counsel "is likely to be a necessary witness, unless "disqualification of the lawyer would work substantial hardship on the client." *See* Mo. S. Ct. Rule 4-3.7(a)(3).  Given the large number of factual and legal issues in petitioner's case, the failure of trial counsel to seek to

withdraw from the case so he could testify about an albeit important issue (whether or not victim Troupe identified petitioner in a police lineup) did not result in *Strickland* prejudice. There was overwhelming evidence of petitioner's guilt, including petitioner's DNA on the victim's clothing (Doc. 16-1, Tr. Trans. at 428-29, 552), his testimony at trial, and the testimony of victim Troupe identifying his car and him as her assailant.  (Doc. 16-1, Tr. Trans. at 458-59, 553.)   In the face of this record, it is unlikely the jury verdict would have been different, even if it found, based on counsel's contrary testimony, that counsel did not hear the victim Troupe make the statement at the lineup that was attributed to her.

Ground 5 is without merit.

## *Ground 6*

Ground 6 alleges that petitioner's trial counsel failed for move for a change of venue for cause.  Petitioner raised this ground in his Rule 29.15 motion.  The circuit court denied the motion, stating:

> 15. The fourteenth allegation in Movant's Amended Motion is that Counsel was ineffective for failing to move for a change of venue for cause. Movant alleges that his case received "more than its fair share of publicity and media attention", and he requested Counsel to move for a change in venue. Counsel failed to do so and Movant states that there were at least eleven negative print articles regarding his cases and the media aired numerous stories linking Movant to these killings, as well as to another pending case.

> A decision not to seek a change of venue is a tactical decision demonstrating no incompetency unless manifestly wrong.  Starr v. State, 788 S.W.2d 549 (Mo. App. 1990); Cooper v. State, 779 S.W.2d 721, 722 (Mo. App. 1989). The movant must prove that but for counsel's failure to request a change of venue the result of the trial would have been different. The court may find that any taint of pretrial publicity was removed during voir dire where the court dismissed all venirepersons who acknowledged they might be influenced by the publicity. Jones v. State, 824 S.W.2d 441(Mo . App . 1991).

> In the instant case counsel inquired of the venire panel whether anyone on the panel was familiar with the victims, crimes, location of the crimes, or recalled hearing about the incidents. No hands were raised (Tr. 22). Later defense counsel questioned the panel regarding whether anyone

read the Whirl newspaper, and whether anyone had read anything in either the Whirl or the Post-Dispatch regarding these incidents. No one on the panel raised their hand and others who were specifically questioned on the issue stated they had no familiarity with these cases. Additionally, Counsel requested that if anyone later realized they were familiar with the case they should advise the Court. At the evidentiary hearing Counsel testified that he recalled that some articles regarding Movant's case were in the newspaper and that he kept articles regarding the case in his file. Counsel testified he could not remember the last time a change of venue was granted on a St. Louis City Circuit Court  case and that St. Louis City was a far more favorable venue for criminal defendants than other areas of the State.

Counsel established on voir dire that the venirepersons were not familiar with this case. Counsel's decision not to seek a change of venue was reasonable and there was no basis for a change of venue to be granted, even if requested. There is also no probability that the result of the trial would have been different if the case had been tried in a different venue. The Court finds Movant's fourteenth allegation is without merit and is denied.

(Doc. 16-11 at 114-16.)

The mere presence of pretrial publicity about a criminal case does not establish a constitutional obligation to seek relief, such as a change of venue. *Skilling v. United States*, 561 U.S. 358, 380-81 (2010).  Juror impartiality does not have to be founded on juror ignorance of the case.  *Id.* at 381.  In petitioner's case, no member of the venire panel indicated familiarity with the case.  No basis for seeking a change of venue was established. And, in any event, the circuit court determined that if the case was tried in a different venue, there was no probability that the outcome would have been different.  The Missouri circuit court reasonably applied *Strickland v. Washington* when it found that no prejudice resulted from counsel's failure to seek a change of venue.

Ground 6 is without merit.


### *Ground 8*

Petitioner's Ground 8 alleges his trial counsel failed to request certain jury instructions regarding his prior convictions, regarding an alibi defense, and regarding the

jury taking notes during the trial.  In its written decision following petitioner's Rule 29.15 evidentiary hearing, the circuit court stated the following:

> Regarding note-taking, Counsel recalled that the Court told the jury they could take notes in opening and closing but he did not recall whether the portion of the instruction relating to note-taking was given. Counsel testified that if the jury had been taking notes in an unauthorized manner he would have brought it to the Court's attention.
>
> * * *
>
> In the instant case Movant's testimony with respect to a prior plea of guilty was evasive, and the testimony surrounding the answer so lacking in credibility, that Movant could not have been prejudiced from Counsel not reminding the jury to only consider this prior plea for purposes of deciding the believability of the Movant. (Tr. 618-638) The Trial Court ruled that evidence of Movant's prior arrests for crimes similar to those for which he was on trial, specifically prior rapes, could not be brought up because such evidence was highly prejudicial.  Further, the crime or crimes to which Movant previously pled guilty were minor in comparison to the crimes at issue in the instant case. Finally, though Counsel did not specifically recall why he did not offer Instruction 310.10, he testified that he believed the instruction would not have been helpful because he did not want to emphasize or keep bringing the matter up to the jury. The Court finds there was no prejudice from failing to request this instruction and that there is no reasonable probability that the result of the trial would have been different if this instruction had been given. Movant's second allegation is without merit and is denied.
>
> * * *
>
> 5. The fourth allegation in Movant's Amended Motion is that his Counsel was ineffective for failing to request the Trial Court to submit an alibi instruction, patterned on MAI-CR 3d 308.04 or MAI-CR3d 308.06, for the charged counts against victim K.J. of Murder First Degree (Count I), Forcible Rape (Count II), and Forcible Sodomy (III).
>
> Counsel testified at the evidentiary hearing that he endorsed Movant's wife, Meghan McGuire, but not specifically as an alibi witness. As trial strategy, the defense intended to establish that Movant was with the victim K.J., earlier, on the night of her murder. Movant acknowledged that he met with K.J. but testified that the last time he saw K.J. she was alive.  Counsel testified that the purpose of Meghan McGuire's testimony was to give a timeline that showed Movant could not have committed the crimes for which he was charged. Counsel testified that the testimony was not that Movant was

34

in Meghan McGuire's presence at the time of the crime, rather that because of the timeline of dropping his son off with Ms. Parker, the son's mother, Movant could not have had time to commit the crime. Both Movant and his wife testified at trial. They testified generally that it was Halloween, they took Movant's son out trick or treating and then Movant drove his son back to the son's mother's residence in Florissant, Missouri. Driving back home Movant saw sixteen year old K.J., who he picked up. Movant testified she was a prostitute and that he engaged in consensual sex with her and he then returned home. The trial was conducted in 2011 and the crime involving K.J. occurred in 2006. Due to passage of time, there were many details that the witnesses could not remember but, as noted by the State, the two recalled that Movant was at home by 10:45 or 11:00 p.m. on the night of K.J. 's murder. The jury heard, and considered, the testimony of both Movant and his wife, as to where Movant was on the night of the crime. The timeline both as to Movant's meeting with K.J. and the time of her death were not certain. It was not unsound judgment to present this testimony without offering an alibi instruction. The Court finds that there is no reasonable probability that the result of the trial would have been different if an alibi instruction had been offered and given. Movant's fourth allegation is without merit and is denied.

\* \* \*

13. The twelfth allegation is that Counsel was ineffective for failing to request that the trial court submit the material in parentheses, in MAI-CR3d 302.0l, instructing the jurors concerning their note-taking during the trial. In accordance with Note on Use 4 for MAI-CR 3d, 302.01 is required to be included in Instruction 1 if juror note-taking is authorized by the trial court as it was in this case.

Immediately prior to opening statements the Court stated "(w)ith that, we'll have the opening statement of the state.  Opening statements are not evidence, so we don't take notes during opening statements or closing argument." (Tr. 234) During closing argument the Court stated  "(l)et me interject for just a second. You haven't done so, but remember, we don't take notes during closing argument. Thank you." (Tr. 7'58) At the evidentiary hearing on Movant's Amended Motion, Counsel testified that if the jury was taking notes in an unauthorized manner he would have brought it to the Court's attention. Any prejudice would be highly speculative in light of the significant evidence of Movant's guilt and the lack of any evidence that any jurors acted in a manner inconsistent with the omitted directions regarding note-taking.  Movant has failed to present competent credible evidence that the incomplete instruction had an effect on the outcome of his trial. The Court

finds that Movant has not met his burden of proof and Movant's twelfth allegation [] is denied.

(Doc. 16-11 at 89, 98-99, 100-02, 112-13.)

The Missouri circuit court reasonably applied *Strickland v. Washington* to a clearly established factual record.  Ground 8 is without merit.

### *Ground 9*

Ground 9 alleges that the state prosecutor knowingly used the perjured testimony of Det. Thomas Carroll.  In support of this ground, petitioner alleges the following:

> Detective Carroll was the responding officer to the scene where H.T. was found, bleeding heavily on the street and going in and out of consciousness.  During trial, Detective Carroll testified that H.T. informed him upon his arrival that "she had been raped and she was pregnant."  (Tr. 487.)

> However, the fact that H.T. had been raped was completely refuted by the record.  H.T. gave a secondary statement to Detective Karon Crocker that she engaged in an act of prostitution with an unknown black male and that after he began choking her, she had no memory of subsequent events.  (Exh. 5.)  she indicated that she would be unable to identify her assailant because she had no memory of the incident and did not mention being raped to Detective Crocker.  (Id.).

> The only real evidence at trial alleging that H.T. was raped was through Detective Carroll's testimony and indications in the police reports that H.T. informed him she was raped at the scene.  Even though petitioner was ultimately acquitted of the rape charge against H.T., this testimony was prejudicial to petitioner because it  painted the picture of an even more brutal assault to the jury.  This prejudicial testimony could have infected the minds of the jurors to think that because of the alleged rape of H.T., petition would have been more likely to commit the other violent acts against her.

(Doc. 24 at 35-36.)  This ground for federal habeas relief was not raised in any of his applications for relief from the circuit court or raised on appeal to the Missouri Court of Appeals.

The record is clear that Det. Carroll did not testify at trial that H.T. was actually raped.  Rather, he testified the victim told him she had been raped.  (*See* Trial Trans., Doc.

16-1 at 135.)  Merely because the victim's statement was contradicted by other evidence does not establish that the detective falsely stated what the victim said.  *Murray v. Delo*, 34 F.3d 1367, 1376 (8th Cir. 1994) (evidence that contradicts a witness's statements is "material for cross-examination, and may cause the jury to disbelieve the witnesses.  They do not, without more, establish perjury.").

This ground for relief is without merit.

### Ground 10

Ground 10 alleges that the cumulative effect of all of petitioner's other nine grounds for federal habeas relief "so infected the proceedings with unfairness that elementary principles of justice demand that" petitioner should receive a new trial.

This ground for relief is legally insufficient on its face to state a claim for federal habeas corpus relief.  *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006) ("We repeatedly have recognized [that] 'a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which by itself meet the prejudice test.'") (quoting *Hall v. Luebbers*, 299 F.3d 685, 692 (8th Cir. 2002)).

### CONCLUSION

For the reasons set forth above, the amended petition of Brandon McGuire for a writ of habeas corpus under 28 U.S.C. § 2254 is **denied**.

Petitioner made no substantial showing that he was deprived of a constitutional right.  Therefore, a certificate of appealability is denied. 28 U.S.C. § 2253(c)(2).

An appropriate Judgment Order is issued herewith.

_David D. Noce_

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Dated this 31st day of March, 2021.